# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
January 13, 2026 Session

## KRISTINA EILEEN CODINO v. CHRISTOPHER JOHN CODINO

**Appeal from the Chancery Court for Haywood County**
**No. 2024-CH-82    Michael Mansfield, Chancellor**

———————————————————

### No. W2025-00630-COA-R3-CV

———————————————————

The parties to this appeal were divorced in Virginia, and the divorce decree provided that they would alternate parenting time with their young child every three weeks. The mother moved to Tennessee, and the father later moved to Minnesota. After residing in Tennessee for ten months, the mother filed a petition in Tennessee seeking to have the Tennessee court enforce the Virginia divorce decree with respect to her allegations of contempt and modify the Virginia decree to name her primary residential parent. The father subsequently sought to register the Virginia decree in Minnesota. After a hearing, the Tennessee court found that Virginia had lost exclusive continuing jurisdiction because all parties had left that state and that Tennessee now had jurisdiction to modify the divorce decree because it qualified as the child's home state. However, the Tennessee court declined to exercise its jurisdiction upon finding that Minnesota would be a more convenient forum for the litigation, primarily based on the fact that the Virginia divorce decree contained an agreement of the parties stating that the child would be enrolled in school in Minnesota upon reaching school age if the father was still residing there. The trial court dismissed the petition and awarded the father a portion of his attorney fees. The mother appeals, arguing, among other things, that the trial court erred in its analysis of the statutory factors under the inconvenient forum statute, erred by dismissing her request for enforcement of the Virginia decree, and erred by granting the father his attorney fees. We agree and reverse the trial court's order of dismissal and its award of attorney fees. This matter is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, P.J., E.S., joined.

Heather C. Grewe, Pinson, Tennessee, for the appellant, Kristina Eileen Codino.

Alexander D. Camp, Jackson, Tennessee, for the appellee, Christopher John Codino.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Kristina Eileen Codino ("Mother") and Christopher John Codino ("Father") married in Virginia in June 2019. Both had children from previous relationships. Father had a daughter who resided in Washington, and Mother had three sons who resided primarily with her and Father. Mother and Father also had one child together, Isaac, who was born in April 2020.

Mother and Father separated in August 2022, when Isaac was just two years old. According to the trial testimony presented in this case, Virginia law provides that a couple must be separated for a year before filing for divorce. As a result, the parties entered into a separation agreement, which governed various issues between them during their period of separation. Neither party was represented by counsel at the time. The separation agreement provided that Virginia was Isaac's home state for purposes of the Uniform Child Custody Jurisdiction and Enforcement Act and that the parties would share joint legal and physical custody of him, with alternating weeks of parenting time. The agreement stated that neither party would relocate with Isaac outside the area without the other party's express written consent, but should either party need to relocate more than sixty miles, if no agreement could be reached, "custody will then be determined by the court." It stated that custody would remain with the parent who was not relocating until an agreement could be reached.

The father of Mother's three older sons, who also lived in Virginia, died in October 2022. During this timeframe, Mother was "laid off" from her job as well. She had stayed in the parties' home with her children, with rent of $3,200 per month, so it was urgent for her to find another job. Around August or September 2023, Mother informed Father that she was applying for various employment positions that may require her to relocate out-of-state, either in Tennessee or another state. Once Mother discussed the possibility of moving, Father also began to consider leaving Virginia because he had no family there either.

Mother ultimately decided to move to Tennessee. On October 27, 2023, the parties met to discuss an amendment to their separation agreement, in contemplation of Mother leaving for Tennessee later that week, on November 1. According to Mother, Father told her that, pursuant to their separation agreement, she could move wherever she wanted, but if she was going to have any form of parenting time with Isaac, she had to sign an amendment to their agreement. Father took the position that the separation agreement

- 2 -

provided that the child would stay with the parent who was not relocating from the point Mother moved out of state. According to Mother, Father told her that if she did not agree to his terms, then "[h]e would keep custody" of Isaac and refuse to sign anything else, and she panicked because she had already released her house in Virginia and rented one in Tennessee, and she and her other children were leaving Virginia within days. The parties signed an amendment that day, which contained several provisions pertaining to custody and visitation. It stated that, for the remainder of 2023, Isaac would live with Father three weeks and then Mother two weeks on an alternating basis until their holiday schedule began,[1] and then beginning in January 2024, he would live with each parent for alternating three-week periods. The addendum stated that neither party would withhold Facetime calls with the child. Notably, it stated, "Both parties agree that when the child turns school age, he will be enrolled in school where the father resides as long as he remains in the state of Virginia or Minnesota. If the father resides in any other state, the parties will assess their situations and agree to what is best for the child at that time." The addendum stated that Mother would "exercise her right to travel on weekends to see the minor child and will have custody of the minor child every other year for Spring Break and half of summer break." Mother moved to Tennessee on November 1.

Father and Mother split the cost of a $900 retainer fee for an attorney to file the paperwork necessary for their uncontested divorce. Neither party met the attorney in person. The final decree of divorce was entered on December 8, 2023, and it incorporated the parties' separation agreement and amendment. It listed the attorney as counsel for the plaintiff, Mother, and stated that Father was pro se.

On December 16, 2023, Father relocated to Minnesota, where he had family. Isaac stayed with Mother in Tennessee for "a little bit longer" than normal during December and/or January so that Father could move and get settled in Minnesota. Isaac also spent "extra time" in Tennessee when Mother remarried and when Father went on a golf trip. Aside from these variations, the parties generally adhered to the three-week visitation schedule between Minnesota and Tennessee for the next several months.

During the summer of 2024, when Isaac was four years old, Mother asked Father to have a Facetime call with Isaac, and he informed Mother that he did not want Isaac to participate in Facetime calls with her because they left Isaac agitated and wanting his mother. The next time Mother requested a Facetime call, Father again protested, stating that she was not considering "what I told you it does to him." Mother believed that Father was trying to drive a wedge between her and Isaac and already felt that the three-week time period away from him was difficult at his age, so she decided to return to court to seek modification of the Virginia decree.

_____

[1] According to Father, he suggested that Isaac spend more time with him, in Virginia, during the period of Mother's move until she got everything settled in Tennessee.

- 3 -

On September 25, 2024, ten months after Mother moved to Tennessee, she filed a petition in the chancery court of Haywood County, Tennessee, asking the court to "accept jurisdiction" in accordance with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), modify the Virginia custody order to designate her primary residential parent, and "enforce" the Virginia order by holding Father in contempt for violating its provisions regarding Facetime calls. She alleged that she had only signed the amendment to the separation agreement because Father advised her that his consent to her relocation was contingent on her agreement to allow him to have primary custody if he wanted to move. Mother asserted that Father used a portion of the language from the separation agreement "as a threat" that she was not allowed to move without his agreement. Mother said she ultimately agreed under duress due to her impending relocation and to escape an abusive marriage. She asserted that she had exercised primary physical custody of Isaac for the majority of the relevant time period since both parties left Virginia. Mother alleged that Virginia lost its status as "home state" within the meaning of the UCCJEA when all the parties left there, and Tennessee had now become Isaac's home state, as she had lived here with him for "the better part of a year."[2] Thus, Mother asked the court to "accept" jurisdiction under the UCCJEA, adopt her proposed parenting plan, and find Father in contempt.

Father filed an answer and subsequently filed a motion to dismiss Mother's petition. He argued that the parties' amendment to the separation agreement "designates the child's home state as where the Father resides," so long as he remained in Minnesota or Virginia upon the child turning school age. Thus, Father contended that Minnesota was "contemplated, agreed upon and ultimately ordered" by the Virginia court "as a potential home state placement for the child upon reaching school age." Father also claimed that he had recently filed a petition for modification of the Virginia decree in Minnesota in accordance with the UCCJEA. However, the document that he attached to his petition was simply a request to *register* the Virginia decree in Minnesota, not a request for modification. The document reflected that it was filed in a Minnesota court on November 15, 2024, a few weeks after Mother filed her petition in Tennessee on September 25. Father contended that the child was spending half the time in Minnesota and that Minnesota was the "more appropriate forum" to hear the litigation, again stating that Minnesota was "explicitly contemplated by agreement" as an appropriate state in which the child would attend school. According to Father, Mother had signed an "agreement for the child's home

_____

[2] Under the UCCJEA as adopted in Tennessee, the term "home state" is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before the commencement of a child custody proceeding." Tenn. Code Ann. § 36-6-205(7). "[P]eriods of temporary absence do not toll the time period required to establish 'home state' status[.]" *Gutzke v. Gutzke*, 908 S.W.2d 198, 202 (Tenn. Ct. App. 1995); *see* Tenn. Code Ann. § 36-6-205(7). In other words, "a period of 'temporary absence' from the state in which the child actually lived for six months does not 'restart the clock in calculating the consecutive six-month period necessary to establish a new home state.'" *Taylor v. McClintock*, No. M2013-02293-COA-R3-CV, 2014 WL 3734894, at *9 (Tenn. Ct. App. July 25, 2014) (quoting *Staats v. McKinnon*, 206 S.W.3d 532, 551 (Tenn. Ct. App. 2006)).

state to be in Father's residential state" in Minnesota. Thus, Father asked the Tennessee court to decline to exercise its jurisdiction on the basis that Tennessee was an inconvenient forum. He also argued that Mother failed to file a certified copy of the judgment she sought to enforce and modify. Father asked the court to dismiss Mother's petition and award him attorney fees. He attached to his motion a copy of the parties' Virginia divorce decree, a copy of the request for registration he filed in Minnesota, and other pertinent documents.

The trial court held a hearing on the motion to dismiss in March 2025. At the outset, Father's counsel asked the trial court to "punt" jurisdiction to Minnesota, for several reasons. He again argued that Mother failed to attach a certified copy of the divorce decree from Virginia, so he sought dismissal based on that "procedural deficiency." At the same time, however, Father admitted that there was in fact a final order of divorce from Virginia that incorporated the parties' separation agreement and amendment, and he noted that it was attached as an exhibit to his own motion to dismiss. Father maintained that the parties' separation agreement "designates the child's home state" as Minnesota and noted that he had registered the divorce decree there. He asked the court to decline to exercise its jurisdiction on the basis that Tennessee is an inconvenient forum under the UCCJEA.[3]

---

[3] Tennessee Code Annotated section 36-6-222 addresses the situation in which a court declines to exercise jurisdiction on the basis that it is an inconvenient forum, providing, in pertinent part:

(a) A court of this state which has jurisdiction under this part to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.
(b) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:
(1) The length of time the child has resided outside this state;
(2) The distance between the court in this state and the court in the state that would assume jurisdiction;
(3) The relative financial circumstances of the parties;
(4) Any agreement of the parties as to which state should assume jurisdiction;
(5) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;
(6) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence;
(7) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; and
(8) The familiarity of the court of each state with the facts and issues in the pending litigation.
(c) If a court of this state determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper.

In response, Mother argued that to the extent there was any issue with the certification of the divorce decree she attached, it was not fatal to her petition. She pointed out that the copies she submitted were identical to the one submitted by Father. Mother also noted that Father had registered the decree in Minnesota. She emphasized, however, that simply registering a decree in another state does not give that state subject matter jurisdiction to modify it, and in any event, Father had not requested modification or even enforcement of the Virginia decree in Minnesota. Mother insisted that Isaac had resided in Tennessee for the majority of the past year and that Tennessee was now his home state. She claimed that Father could not use the parties' agreement regarding school enrollment to "confer" subject matter jurisdiction. She also asked the court to find that Tennessee was a convenient forum for the litigation considering the relevant factors.

The trial judge asked Father to clarify whether he sought modification of the decree in Minnesota, and Father stated that he did not. He said he had essentially started the process to register it. The trial judge noted that he had not been contacted by any court in Minnesota. The trial judge also asked Father to clarify the nature of his objection to the certification of the divorce decree that Mother filed. Father's counsel admitted that there was "a copy of a certified copy." The trial judge pointed out that Tennessee Code Annotated section 36-6-232(a) provides, regarding petitions for enforcement: "A petition under this part must be verified. Certified copies of all orders sought to be enforced and of any order confirming registration must be attached to the petition. A copy of a certified copy of an order may be attached instead of the original."

The trial court then heard testimony from Father via Zoom. He testified that Isaac was currently four years old and would be ready to begin kindergarten when school began later that year, in August. Isaac currently attended daycare in Minnesota. Father worked in construction from 7:00 a.m. to 4:00 p.m., so Isaac attended daycare from around 6:30 a.m. to 4:15 p.m. Father testified that Isaac is not enrolled in any extracurricular activities in Minnesota. He testified that he has family members who reside in Minnesota, including his mother, stepfather, sister, brother-in-law, and their four children. Father originally moved in with his mother upon moving to Minnesota but had since moved into a townhome with his fiancée and her teenage daughter. Father testified that he is financially stable and that he pays rent to his fiancée.

Father admitted that Isaac had stayed with Mother in Tennessee "a little bit longer" than scheduled in December or January, after he moved on December 16, so that he could focus on moving from Virginia to Minnesota. He said that the parties had "pretty much" been following the three-week rotation since January 2024, although he admitted there were multiple examples of accommodations for things like his golf trips. He said Isaac also stayed in Tennessee for "extra time" when Mother got married. When asked if he would admit that Isaac had not spent fifty percent of the time in Minnesota, Father said, "I cannot speak to that." Isaac suffers from severe eczema that requires medicated ointments

and creams multiple times per day to prevent itching and bleeding. Father acknowledged that he had never taken Isaac to any dermatologist or specialist in Minnesota with regard to his condition. He also admitted that Isaac had never been to any dentist in Minnesota.

Father also testified regarding the amendment the parties signed days before Mother moved to Tennessee. He insisted that Isaac would have had to stay with him in Virginia "from the point [Mother] moved out of state" pursuant to the original separation agreement.[4] Father said he did not want to lose that right by moving to Minnesota and wanted to "protect[] [him]self," so "what I felt comfortable with was putting in writing that when he gets school aged, he will reside with me." Father testified that he had requested and received a certified copy of the Virginia divorce decree, and he introduced it as an exhibit at trial. He testified that he had registered the decree in Minnesota. He said his "goal in that was to seek and keep jurisdiction in Minnesota where we, per our agreement and understanding, agreed to." However, Father testified that he was not seeking modification of the Virginia decree in Minnesota. Father testified that he believed Minnesota would be the "more appropriate forum" for litigation "especially" since the parties had agreed that Minnesota "could be the potential spot." He agreed that it was not practical for Isaac to continue going back and forth between Tennessee and Minnesota for three-week periods as he grew older but believed he should be in Minnesota with him.

Father was also asked about the allegation in Mother's petition about a history of domestic violence and whether he denied domestic abuse. He replied, "Define domestic abuse. Did we argue and – and scream? Yeah, we both did." Father stated that he had never been arrested or investigated by law enforcement for domestic violence against Mother.

Mother's oldest son, Ryan, testified next. He was 22 years old at the time of trial but had lived with Mother and Father for about three years during their marriage in Virginia. Ryan and Isaac are half-brothers. Ryan described episodes during the marriage when Father would yell at Mother and call her names. He recalled one particular episode toward the end of the marriage when Mother asked Father to stop drinking and poured out his alcohol, and Father got increasingly angry and "ended up cocking his fist back as if to hit my mother," such that Ryan feared for her safety and told Father to stop. Ryan testified that there were multiple instances during the marriage when he feared for Mother's safety and that he was "very much on edge." He testified that the verbal abuse also occurred in front of Isaac. Ryan testified that he now lives in Tennessee with Mother and her current husband and his siblings, and there is no such behavior in their home. He testified that he and his siblings play with Isaac when he is there. He also testified regarding the severity

---

[4] As previously noted, the separation agreement actually provided that neither party would relocate from the area with Isaac without the other party's express written consent, but should either party need to relocate more than sixty miles, if no agreement could be reached, "custody will then be determined by the court."

of Isaac's eczema and the fact that he sometimes has to wrap his hands in gauze.

Mother's current husband ("Stepfather") testified next. He had two teenagers from a previous marriage, and the youngest lived with him and Mother. Stepfather also worked in construction and owned a six-bedroom home and farm. Stepfather testified that he had attended all of Isaac's doctor appointments in Tennessee related to his eczema, and he noted that Isaac had recently been hospitalized as well, for three days. Stepfather testified that he had undergone training on how to give Isaac injections of medication for his eczema. He testified that Isaac attends church in Tennessee, and he participates in taekwondo three days per week. Stepfather testified that Isaac and Mother also attend "Mommy and Me" classes weekly at their church. He testified that Mother works part-time but stays home during the three-week periods when Isaac is in Tennessee in order to care for him.

Finally, Mother testified. She said that Isaac's three older half-brothers live with her and Stepfather on the farm. She testified that Stepfather's parents also live five minutes away from their house and spend time with them. Mother testified that since she had moved to Tennessee on November 1, 2023, Isaac had spent the majority of the time in Tennessee with her. She described, for instance, Isaac spending extra time in Tennessee while Father went to a golf tournament. Mother also described Isaac's extracurricular activities in Tennessee, and she testified that all of his medical treatment had been here. She testified that he was currently under the care of a team at LeBonheur Children's Hospital, seeing doctors in both Memphis and Jackson. She had also undergone the training necessary to administer his injections. Mother testified that Isaac's pediatrician was in Tennessee as well. She was not aware of him ever seeing a doctor in Minnesota. Mother described Isaac as "established here" in Tennessee.

Mother testified regarding Father's issues with drinking and verbal abuse during their brief three-year marriage. She testified that Father drank every week and that the verbal abuse occurred every couple of months. She also described the incident witnessed by Ryan, when Father "swung his arm back" as if he was going to hit her after she poured out his alcohol. Mother said that no physical abuse ever actually occurred and that it was "just intimidation."

Mother testified that she found an inexpensive attorney who was in his eighties and had recently closed his firm but still handled uncontested divorces for $900. She said she asked Father to split the cost with her and he agreed. She said they prepared the paperwork themselves from online documents and never actually met the attorney, and that he simply filed the paperwork for them. She said when the time came for the final paperwork to be submitted, Father wanted to change some things at the last minute, and she panicked because she was trying to avoid a huge legal battle just five days before she was leaving Virginia and could not afford to pay an attorney separately. Mother explained that she was in a difficult position because she was processing the death of her older children's father

and laid off from her job, so she had to find employment as soon as possible, even if in another state. She testified that Father told her that if she did not agree to those terms then he would keep custody of Isaac and she would be voluntarily giving up custody because he would not sign anything else. Thus, Mother testified that she believed she would not have been able to move if she had not signed the amendment, and she had already given up her home in Virginia and rented one in Tennessee.

Mother also described Father's attempts to end her Facetime calls with Isaac during the summer of 2024. She testified that she was already having a hard time going three weeks without seeing Isaac and that she believed Father was trying to drive a wedge between them with a communication barrier. She testified that she decided it was time to "do what's right for [Isaac]."

At the conclusion of the testimony, the trial judge asked the parties' attorneys if they were familiar with forum selection clauses utilized in other settings and asked whether that law would apply in this situation. In other words, he asked if, in the event that two different states could have jurisdiction, was there any reason why the parties could not agree which of those states to litigate in. Mother argued that the law regarding forum selection clauses generally would be inapplicable in the UCCJEA context. She argued that the UCCJEA provides specific factors for consideration for determining whether a forum is inconvenient, but under those factors, any agreement by the parties as to which state should assume jurisdiction would be only one factor to consider, in the event that such an agreement did exist. Father's counsel agreed that an agreement is one factor to consider and "would not be dispositive." Mother also argued that subject matter jurisdiction cannot be conferred on a court by agreement. The trial judge gave the parties the opportunity to submit briefs on the issue of "the enforceability of forum selection clauses in Tennessee UCCJEA cases" and took the matter under advisement.

On April 24, 2025, the trial court entered an order granting Father's motion to dismiss. After summarizing the testimony of the various witnesses at the hearing, the trial judge noted that he "participated in a telephone conference with the parties and the court in Minnesota . . regarding certain unfortunate circumstances that have arisen since the March 20, 2025, hearing in this Court[.]" However, the order stated that "this Court does not find it necessary to communicate with any other court concerning the issues that were tried during the March 20, 2025, hearing in order to render its decision, which decision the Court orally communicated to the parties and the Minnesota court during their April 17, 2025 telephone conference and which is set out more fully below."

The trial court found that Virginia was originally the child's home state when it entered the initial custody determination in this case. It found that the Virginia court had exclusive continuing jurisdiction over the determination, under the UCCJEA, until, among other things, "[a] court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state."

- 9 -

Tenn. Code Ann. § 36-6-217(a)(2). The trial court found based on the undisputed evidence presented at the hearing that neither Isaac nor his parents reside in Virginia anymore. The trial court also found that Tennessee has now "qualified as the child's home state" for the six months preceding the filing of Mother's petition (although the trial court noted parenthetically that Minnesota would also qualify as the home state). As a result, the trial court concluded that it would have jurisdiction to make an initial determination as provided by Tennessee Code Annotated section 36-6-216,[5] and therefore, "this Court has jurisdiction to modify the initial custody determination" from the Virginia court pursuant to section 36-6-218,[6] "should it choose to exercise such jurisdiction." Nevertheless, the trial court noted that it had authority to decline to exercise jurisdiction if it determined that Tennessee was an inconvenient forum pursuant to section 36-6-222.

The trial court found that "the evidence presented at the March 20, 2025 hearing and the statements of counsel for the parties and of Judge Knight in Minnesota on the April 17, 2025, conference call preponderates in favor of this Court declining to exercise its jurisdiction as Minnesota is a more convenient forum for litigation of these issues under

---

[5] Tennessee Code Annotated section 36-6-216 provides, for an initial custody determination:

(a) Except as otherwise provided in § 36-6-219, a court of this state has jurisdiction to make an initial child custody determination only if:
(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
(2) A court of another state does not have jurisdiction under subdivision (a)(1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under § 36-6-221 or § 36-6-222, and:
     (A) The child and the child's parents, or the child and at least one (1) parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
     (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;
(3) All courts having jurisdiction under subdivision (a)(1) or (a)(2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under § 36-6-221 or § 36-6-222; or
(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (a)(1), (a)(2), or (a)(3).

[6] Tennessee Code Annotated section 36-6-218 provides, regarding modification:

Except as otherwise provided in § 36-6-219, a court of this state may not modify a child-custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under § 36-6-216(a)(1) or (2), and:
(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under § 36-6-217 or that a court of this state would be a more convenient forum under § 36-6-221; or
(2) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

- 10 -

the factors set forth in Tenn. Code Ann. § 36-6-222 quoted above." The trial court found that seven of the eight factors did not favor either jurisdiction. Specifically, regarding the length of time Isaac had resided in each state, it found that Isaac resided "an equal amount of time in Minnesota and Tennessee . . . with only a couple of insignificant, agreed upon variations." Tenn. Code Ann. § 36-6-222(b)(1). It found that the distance and financial circumstances of the parties did not favor either state, and neither did the nature and location of the evidence required to resolve the litigation. Tenn. Code Ann. § 36-6-222(b)(2), (3), (5). It found that the ability of the courts to decide the issues did not favor either state, and neither court was more familiar with the parties or issues. Tenn. Code Ann. § 36-6-222(b)(6), (8). Regarding the factor addressing domestic violence, Tenn. Code Ann. § 36-6-222(b)(7), the trial court found that "while Father may have verbally abused Mother at some point during their marriage after he had drank too much alcohol on occasion, such abuse was rare and out-of-character for Father," such that this factor did not favor either jurisdiction.

The trial court found that the only factor that weighed in favor of either jurisdiction was factor (4), which requires consideration of "[a]ny agreement of the parties as to which state should assume jurisdiction." Tenn. Code Ann. § 36-6-222(b)(4). The trial court found that this factor favored Minnesota. It noted that the parties' amendment to the separation agreement provided, "Both parties agree that when the child turns school age, he will be enrolled in school where the father resides so long as he remains in the state of Virginia or Minnesota." The trial court conceded that the parties "did not specifically agree what state should have jurisdiction to decide any custody disputes that arose between them after their divorce [w]as finalized." However, the court found that "the parties did agree at the time their divorce was finalized that the child would be enrolled in school wherever the father resided at that time, so long as the father resided in either Virginia or Minnesota." The trial court noted that marital dissolution agreements are deemed valid and enforceable contracts in Tennessee absent a showing of fraud or coercion.[7]

The trial court stated that "the mere fact that the parties made an agreement is not dispositive of the issue under Tennessee law," as it was simply one factor to consider under the UCCJEA. Still, the trial court recognized that it was "the one factor that favors one side or the other" under its analysis. The trial court recognized that, under Tennessee law, parents cannot bind a court with an agreement affecting the best interest of a child, as the best interest of the child is always the paramount concern. "Nevertheless, with regard to forum selection clauses in standard contract cases," the court continued, Tennessee courts

---

[7] The trial court noted Mother's testimony that she signed the agreement under duress because Father threatened to take the child away if she did not sign it. It found that "Father testified unequivocally and credibly that he would not have moved to Minnesota after the parties' divorce had Mother not signed the agreement that they negotiated, as he felt that if he stayed in Virginia, he would keep custody of the child once the child started school, regardless where Mother moved." The trial court found that "Father gave up a possibly superior custodial arrangement in order to sign that agreement to accommodate Mother's desires" to move to Tennessee as soon as possible.

generally deem them binding and enforceable.  Ultimately, the trial court found that the best interest of the child would not be adversely affected "by having the parties' agreement enforced in the first instance and for the Minnesota court, where the agreement states the child should attend school, determine whether the agreement should be modified thereafter."  Thus, the court determined that the litigation should take place in Minnesota.  The trial court ordered Mother to be responsible for one-half of Father's attorney fees incurred in defending against the petition under the UCCJEA and dismissed the petition.  Mother timely filed a notice of appeal.

Mother subsequently filed a motion for this Court to consider post-judgment facts, pursuant to Tennessee Rule of Appellate Procedure 14, regarding litigation that occurred in Minnesota and Tennessee following the entry of the trial court's order.  We hereby grant that motion.[8]  Those documents reflect that the Virginia divorce decree was registered by the Minnesota court, and Father later filed a petition for enforcement of the Virginia decree in Minnesota.  After the aforementioned hearing in Minnesota on April 17, 2025, the Minnesota court entered an order on August 6, 2025.  The Minnesota court found that the parties were divorced by a Virginia decree in 2023, and the parties "agreed that when the child turns school age, he will be enrolled in school where the father resides, as long as he remains in the state of Virginia or Minnesota."  The Minnesota court found that Mother had filed a petition for modification in Tennessee in September 2024, and Father had filed a request to register the decree in Minnesota in November 2024, along with a subsequent petition for enforcement.  The order states that Chancellor Mansfield, in Tennessee, "appeared before this court at the April 17, 2025 hearing and informed the Court he would be granting Petitioner's motion to dismiss."  The Minnesota court noted that Chancellor Mansfield subsequently entered an order dismissing the case, stating that even though Tennessee had jurisdiction to modify the initial custody determination from Virginia, it was declining to do so on the basis that Minnesota was the more convenient forum.  The Minnesota court noted that Mother filed a notice of appeal of that order.  The Minnesota court found it appropriate to stay the proceedings in Minnesota "pending the Tennessee appeal."  However, the Minnesota court found that the Virginia separation agreement, signed when the child was only three years old, was "speculative, at best," "not in the best interests of the child," and "should never have been approved in the first place," as it failed to establish a primary residence for the child or account for any future needs of the child or "what the parties' home situation will look like."  The court found that the parenting schedule, "as it stands, is completely inoperable," as the three-week rotation becomes impossible upon the child reaching kindergarten, reducing Mother's parenting time to occasional weekends and half of school breaks would be a significant reduction in her parenting time, and in any event, Father had not requested modification of the parenting

---

[8] "Rule 14(a) empowers an appellate court to consider certain facts that 'occur[ ] after judgment,' are 'capable of ready demonstration[,]' and 'affect[ ] the positions of the parties or the subject matter of the action[.]'" *Abdur'Rahman v. State*, 648 S.W.3d 178, 185 n.2 (Tenn. Crim. App. 2020); *see, e.g.*, *Cliburn v. Bergeron*, No. M2001-03157-COA-R3-CV, 2002 WL 31890868, at *5-6 (Tenn. Ct. App. Dec. 31, 2002) (granting a motion to consider post-judgment facts represented by court filings in a UCCJEA case).

schedule in Minnesota.

The Minnesota court considered the same eight factors analyzed by the trial court in this case and stated that it "disagrees with the Tennessee court's determination that Minnesota is the more appropriate forum." The Minnesota court found that it did not have enough information to make a finding on the factor regarding domestic violence, and it noted that the factors regarding the length of time the child had resided in the state, the distance, and the financial circumstances were relatively equal. The Minnesota court noted that the Tennessee court "hinged its analysis and ultimate decision to decline jurisdiction" on factor four, requiring consideration of any agreement between the parties "as to which state should assume jurisdiction." The Minnesota court recognized that the divorce decree provided that the child would be enrolled in school where Father resided as long as he remained in Minnesota or Virginia. However, the Minnesota court found that "[t]his is an agreement as to where the child shall reside and be enrolled in school; it is not an agreement as to which state shall assume future jurisdiction of this case." Moreover, the Minnesota court found that the agreement itself was "unworkable and not in the child's best interest."

The Minnesota court found that the remaining three factors all weighed in favor of Tennessee. Regarding the nature and location of the evidence required to resolve the litigation, the Minnesota court found that one of the primary issues in this case is the child's medical condition, as he suffers from severe eczema and has undergone extensive treatment due to his diagnosis. The court noted that the child receives monthly injections in Tennessee, he has Tennessee medical insurance, his treating doctors are all in Tennessee, and he does not even have a primary physician established in Minnesota. The Minnesota court found that some witnesses will invariably be required to travel in either case, but "as indicated by the child's extensive medical history, the nature and location of a majority of the essential evidence required to resolve this case will be located in Tennessee."

Regarding the ability of each state to decide the issue expeditiously, the Minnesota court noted that the Tennessee court had already heard Mother's request for it to accept jurisdiction, and Mother had already sought modification of the decree in Tennessee. The Minnesota court also noted the Tennessee court's initial decision that it did have jurisdiction to modify the decree. The Minnesota court determined that continuing the litigation in Tennessee "would be the most appropriate and expeditious route," considering that no request to modify was presently before the Minnesota court, and an evidentiary hearing had already been held in Tennessee. The court found that "Mother had the foresight to see that the terms of the Virginia decree are unworkable and are not in the child's best interests," and she "appropriately filed a motion in Tennessee requesting that Tennessee accept jurisdiction over this case and modify custody and parenting time." The court found that Father only sought to register and enforce the Virginia decree and failed to consider that its terms were not in the child's best interest.

Finally, regarding the familiarity of each court, the Minnesota court similarly noted

that Tennessee had already held an evidentiary hearing and considered testimony and exhibits related to the issues, already having been apprised of much of the information necessary to accept jurisdiction and modify the Virginia decree. The court found it "undeniable" that "the Virginia decree must be modified," and Tennessee was "the more appropriate jurisdiction" to do so because a petition for modification had already been filed there, it had jurisdiction to modify, and it had already heard evidence regarding the child. Proceeding in Minnesota, the court observed, would essentially require the parties to "start over." Thus, the court concluded that this factor "favors Tennessee."

Based on its analysis of these factors, the Minnesota court stated that it disagreed with the Tennessee court's ultimate determination that Minnesota was the more appropriate forum, but the court declined to make a decision and stayed the proceedings pending the outcome of this appeal. The Minnesota court subsequently denied a request to exercise temporary emergency jurisdiction as well and ruled that all Minnesota proceedings would remain stayed pending the resolution of this appeal.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1. Whether the trial court erred in its analysis of the application of the inconvenient forum statute;
2. Whether the trial court erred by failing to communicate with the Minnesota court prior to making the decision to decline jurisdiction;
3. Whether the trial court erred by declining to assert significant connection jurisdiction;
4. Whether the trial court erred in failing to assert enforcement jurisdiction;
5. Whether the court erred by granting Father an attorney fee award.

For the following reasons, we reverse the trial court's order of dismissal and its award of attorney fees and remand for further proceedings consistent with this opinion.

## III. DISCUSSION

On appeal, Mother argues that this litigation "has morphed into a jurisdictional stalemate that has left a young boy in limbo" without any state exercising jurisdiction over the matter. She asserts that Virginia lost jurisdiction due to all parties leaving the state, Tennessee had jurisdiction but declined to exercise it (while also failing to assert enforcement jurisdiction), and Minnesota stayed all proceedings pending the outcome of this appeal. Mother asks this Court to "unravel the jurisdictional web."

The UCCJEA "governs jurisdiction between Tennessee and other states over child

custody proceedings." *Button v. Waite*, 208 S.W.3d 366, 369 (Tenn. 2006). It has been adopted in one form or another in all fifty states and is codified in Tennessee at Tenn. Code Ann. §§ 36-6-201, *et seq.* *Hernandez v. Hernandez*, No. W2018-01388-COA-R3-CV, 2019 WL 3430534, at *4 (Tenn. Ct. App. July 30, 2019). The UCCJEA was enacted "to establish national standards for jurisdiction regarding initial custody determinations, to specify the circumstances under which a state can modify another state's child custody determination, to establish procedures for enforcement of both initial custody orders and modification orders, and to prevent contradictory orders by the courts of different states." *Kapustka v. Kapustka*, No. M2015-01984-COA-R3-CV, 2016 WL 3250120, at *4 (Tenn. Ct. App. June 3, 2016). Even if a trial court has jurisdiction under the UCCJEA, it "may, at any time, decline to exercise that jurisdiction if it determines that Tennessee is no longer a convenient forum under the circumstances and that another state is a more appropriate forum." *Id.* (citing Tenn. Code Ann. § 36-6-222).

Whether a court has jurisdiction under the UCCJEA is a question of law subject to de novo review. *Kapustka*, 2016 WL 3250120, at *2 (citing *Busler v. Lee*, M2011-01893-COA-R3-CV, 2012 WL 1799027 at *2 (Tenn. Ct. App. May 17, 2012)). However, a court's decision to decline to exercise its jurisdiction under the UCCJEA is a discretionary one, which we review for an abuse of discretion. *Id.* Thus, "[w]hen a trial court declines to exercise subject matter jurisdiction based on a finding that Tennessee is an inconvenient forum, 'an abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Id.* at *3 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). "While the abuse of discretion standard is a deferential standard of review, even '[d]iscretionary decisions must take the applicable law and the relevant facts into account.'" *In re Arabella L.*, No. M2017-01069-COA-R3-JV, 2017 WL 5713939, at *2 (Tenn. Ct. App. Nov. 28, 2017) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Here, the parties agree with the trial court's findings that Virginia lost exclusive continuing jurisdiction and that Tennessee had jurisdiction to modify the Virginia court's initial custody determination.[9] The issue, then, is whether the trial court abused its discretion in declining to exercise its jurisdiction. As noted above, Tennessee Code Annotated section 36-6-222 addresses the situation in which a court declines to exercise jurisdiction on the basis that it is an inconvenient forum pursuant to the UCCJEA, and it provides:

> (b) Before determining whether it is an inconvenient forum, a court of this

---

[9] In the argument section of his brief, Father states that the trial court "correctly concluded" that Tennessee satisfied the definition of "home state" under the UCCJEA at the time of the petition "and therefore had jurisdictional authority to proceed."

The trial court parenthetically noted that Minnesota would also satisfy the definition of "home state." We express no opinion regarding that ruling.

- 15 -

state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(1) The length of time the child has resided outside this state;

(2) The distance between the court in this state and the court in the state that would assume jurisdiction;

(3) The relative financial circumstances of the parties;

(4) Any agreement of the parties as to which state should assume jurisdiction;

(5) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(6) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence;

(7) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; and

(8) The familiarity of the court of each state with the facts and issues in the pending litigation.

(c) If a court of this state determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper.

According to the Official Comment, this section "authorizes courts to decide that another State is in a better position to make the custody determination, taking into consideration the relative circumstances of the parties. If so, the court may defer to the other State." Tenn. Code Ann. § 36-6-222 cmt.[10]

Notably, however, pursuant to subsection (c), even if a trial court determines that it is an inconvenient forum, dismissal is not the appropriate remedy. *See id.* As the Official Comment makes clear:

[T]he court may not simply dismiss the action. To do so would leave the case in limbo. Rather the court shall stay the case and direct the parties to file in the State that has been found to be the more convenient forum. The court is also authorized to impose any other conditions it considers appropriate. This might include the issuance of temporary custody orders during the time necessary to commence a proceeding in the designated State, dismissing the case if the custody proceeding is not commenced in the other State or resuming jurisdiction if a court of the other State refuses to take the case.

---

[10] In *Iman v. Iman*, No. M2012-02388-COA-R3-CV, 2013 WL 7343928, at *5 (Tenn. Ct. App. Nov. 19, 2013), we analyzed section 36-6-222 alongside the doctrine of forum non conveniens, which we noted "is a drastic remedy to be exercised with caution and restraint."

Tenn. Code Ann. § 36-6-222 cmt.; *see also Kapustka*, 2016 WL 3250120, at *6 (affirming a trial court's conclusion that Tennessee was an inconvenient forum but reversing dismissal of the petition because the trial court "may not simply dismiss the action," and "the proper procedure would have been for the trial court to issue a stay of [the] action and direct the parties to file the action in the state of Florida, which the court determined was a more convenient forum").

We now turn to the statutory factors. The trial court considered all of the applicable factors but found that all of them weighed equally in favor of either jurisdiction except one – factor four, "[a]ny agreement of the parties as to which state should assume jurisdiction." Tenn. Code Ann. § 36-6-222(b)(4). The trial court found that this was the only factor that favored Minnesota, based on the provision regarding school enrollment in the amendment incorporated into the divorce decree. On appeal, Mother argues that "no part of [the] Virginia Order reflects an agreement as to which state would assume future jurisdiction." We agree.

This Court recently considered a similar issue in *Hibdon v. Goynes*, No. M2024-00290-COA-R3-JV, 2025 WL 3679028 (Tenn. Ct. App. Dec. 18, 2025). In that case, a father petitioned a Tennessee court to modify a parenting plan. *Id.* at *1. The agreed parenting plan, entered in Tennessee, had allowed the mother to relocate to Arkansas with the child, and the child spent most of the time in Arkansas after the move but still visited the father in Tennessee. *Id.* The mother claimed that Tennessee was an inconvenient forum for the modification petition and asked the trial court to decline to exercise jurisdiction under the UCCJEA. *Id.* The trial court analyzed the statutory factors and denied her request to dismiss or transfer the matter. *Id.* On appeal, we explained that the UCCJEA provides a list of factors at Tennessee Code Annotated section 36-6-222(b) to guide the trial court's decision when determining if it is an inconvenient forum under the circumstances and that a court of another state is more appropriate. *Id.* at *4. We explained that the trial court's decision is ultimately reviewed for an abuse of discretion, which may occur if the trial court applied the wrong legal standard, reached an illogical or unreasonable decision, or based its decision on a clearly erroneous assessment of the evidence. *Id.* The trial court had considered all of the appropriate factors and simply concluded that, on balance, most of them weighed in favor of a Tennessee forum. *Id.* The mother argued that the trial court "failed to treat the agreed parenting plan, which allowed her to move to Arkansas, as evidence of an agreement to litigate custody issues in Arkansas" within the meaning of factor four of the statutory factors. *Id.* at *5. We deemed this argument "unpersuasive," noting Mother's own recognition that "the parties never expressly agreed to litigate in Arkansas either in the agreed plan or otherwise." *Id.* Thus, we found that the trial court applied the correct legal standard and reached a logical decision based on a reasonable assessment of the evidence. *Id.*

We reach the opposite conclusion here. The trial court seems to have interpreted

- 17 -

the parties' agreement regarding where the child would attend school as some type of implicit agreement regarding jurisdiction for purposes of Tennessee Code Annotated section 36-6-222. This was not the correct legal standard. The statute requires consideration of "[a]ny agreement of the parties as to which state should assume jurisdiction." Tenn. Code Ann. § 36-6-222(b)(4). There is no such agreement in this case.

In *Miljenovic v. Miljenovic*, No. E2013-00238-COA-R10-CV, 2013 WL 6665051, at *1 (Tenn. Ct. App. Dec. 17, 2013), parents were divorced by a New Jersey divorce decree, which incorporated a property settlement agreement allowing the mother and children to relocate to Tennessee. When the father later attempted to modify the judgment in Tennessee, he argued that the Tennessee court had jurisdiction because New Jersey "released its jurisdiction" in the divorce decree. *Id.* at *2. He pointed to a provision entitled "Removal from Jurisdiction," which provided that the mother and children would be relocating to Tennessee. *Id.* We explained that this argument was meritless because the provision "clearly relates to the relocation of the minor children, not New Jersey's jurisdiction of the case." *Id.*[11]

Similarly, in this case, there simply is no "agreement of the parties as to which state should assume jurisdiction" within the meaning of the statute, Tenn. Code Ann. § 36-6-222(b)(4), as the parties' agreement only addresses where the child would someday be enrolled in school. *See Shanoski v. Miller*, 780 A.2d 275, 276-79 (Me. 2001) (declining to find an "agreement of the parties as to which state should assume jurisdiction" within the meaning of this factor when the parties had agreed during the divorce that "jurisdiction and venue over this divorce matter and the subsequent reference relating to parental contact lies in Maine" but this provision was limited on its face to the divorce itself and an unresolved visitation matter and "was not an agreement that Maine would exercise jurisdiction in all future disputes"); *Adam N. v. Darah D.*, 165 N.Y.S.3d 53, 55 (N.Y. App. Div. 2022) (declining to find an "agreement of the parties as to which state should assume jurisdiction" where the alleged agreement between the parties was in a relocation provision that addressed "choice of law" but not "choice of forum"); *A.D. v. M.A.B.*, 989 A.2d 32, 37 (Pa. Super. Ct. 2010) (declining to interpret a custody agreement providing that the father may petition to see the child in Pennsylvania as a forum selection clause because it was permissive and did not designate the state "as the only forum for litigation").

To illustrate the difference, we note the facts before the Kentucky Court of Appeals in *Day v. Day*, 673 S.W.3d 454, 456-57 (Ky. Ct. App. 2023), where the parties had entered into what the Court found to be a forum selection clause. Their agreed order regarding relocation stated: "The parties agree that the McCracken Family Court will retain jurisdiction of this matter, and all future modifications of this agreement will be through the McCracken Family Court." *Id.* Both parents and the child moved to Florida, and the father later filed a petition to modify in the McCracken Family Court in Kentucky. *Id.* at

---

[11] *Miljenovic* involved the UCCJEA but not the inconvenient forum factors of section 36-6-222.

457.  The Kentucky Court of Appeals explained the following with respect to forum selection clauses in the UCCJEA context:

> [W]e will only briefly address [the father's] claim that the forum selection agreement required the family court to exercise jurisdiction.  Kentucky recognizes that parties to an agreement may agree to a forum selection clause if it is reasonable. *Prudential Res. Corp. v. Plunkett*, 583 S.W.2d 97, 99 (Ky. App. 1979). We agree that the purpose of the UCCJEA is "the avoidance of jurisdictional competition and conflict with other states in child custody matters." *Hearld v. Hearld*, 278 S.W.3d 162, 164 (Ky. App. 2009) (citation omitted).
>
> However, it is equally clear that such an agreement cannot deprive a court of its discretion to accept or deny continuing jurisdiction under the UCCJEA. [The father] refers this Court to non-published opinions which indirectly refer to forum selection clauses or address agreements between parties ratified by the trial courts. We have reviewed those and do not find them applicable. We also note that the vast majority of courts across the 49 states that adhere to the UCCJEA have not allowed such agreements to trump the UCCJEA itself as to do so would be antithetical to the purposes of the UCCJEA. Rather, a forum selection clause is only one of the eight factors to be determined by a court when it proceeds under KRS 403.834 to determine if a particular venue is now inconvenient.

*Id.* at 460.  The Court concluded that the family court did not err in declining to exercise its jurisdiction and that the parties' agreement did not require such exercise of jurisdiction. *Id.* at 461.  *See also Horgan v. Romans*, 851 N.E.2d 209, 213 (Ill. App. Ct. 2006) ("Respondent would have us . . . find that, any time the parties have agreed to a forum for subsequent proceedings, such a forum selection should trump the other factors to be balanced by the circuit court pursuant to the UCCJEA inconvenient-forum provision. To do so would contradict the statutory language of section 207. On its face, section 207 bestows on the trial court the discretion to receive all the relevant information, examine the totality of the circumstances, and balance the enumerated factors to arrive at a determination of whether another forum would be more convenient to the parties. The fifth factor in section 207 specifically allows the circuit court to consider "*any agreement of the parties* as to which state should assume jurisdiction" alongside and with equal importance as the other seven factors."); *Friedman v. Eighth Jud. Dist. Ct. of State, ex rel. Cnty. of Clark*, 264 P.3d 1161, 1167 (Nev. 2011) ("The UCCJEA gives forum selection agreements a role to play in child custody proceedings, but it is a supporting, not a lead, role."); *A.D. v. M.A.B.*, 989 A.2d at 38 (Pa. Super. Ct. 2010) (explaining that "an agreement by the parties as to which state will assume jurisdiction, is merely one of eight factors enumerated in the UCCJEA," so "[e]ven if the trial court had determined that the wording of the agreement was a forum-selection clause, it would be outweighed here by at least six of the eight factors"); *In Int. of T.B.*, 497 S.W.3d 640, 648-49 (Tex. App. 2016) (recognizing the

parties' agreement that enforcement and modification of their agreement would be brought in Florida but explaining that the parties' jurisdictional agreement is simply one factor in an inconvenient-forum analysis, it is not binding on the court or conclusive, and the other factors supported a finding that Florida was an inconvenient forum).[12]

The trial court in this case found that factor four was the only factor that weighed in favor of Minnesota, and all the other factors weighed equally in favor of either state. We conclude that factor four was inapplicable, as there was no "agreement of the parties as to which state should assume jurisdiction." Tenn. Code Ann. § 36-6-222(b)(4). Thus, we are left with the trial court's finding that all other factors were equal. However, from our review of the evidence, some of the factors are equal and some favor Tennessee. Examining the length of time the child has resided in each state, Tenn. Code Ann. § 36-6-222(b)(1), we note that Mother moved to Tennessee first, on November 1, 2023, and Father moved to Minnesota over six weeks later, on December 16, 2023. Since then, Isaac has spent "extra time" with Mother in Tennessee while Father was moving, during his golf trip, and when Mother got married. So, we conclude that this factor weighs in favor of Tennessee, albeit slightly.

The second and third factors, regarding the distance between the courts and the financial circumstances of the parties, appear to be equal. Tenn. Code Ann. § 36-6-222(b)(2), (3). The seventh factor is "[w]hether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child." Tenn. Code Ann. § 36-6-222(b)(7). We acknowledge Mother's testimony regarding verbal abuse and intimidation during the marriage but find such behavior is unlikely to continue in the future and that there is little need for Tennessee to protect the parties and the child under these circumstances, as the parties apparently only see each other now at airport exchanges. This factor does not weigh in favor of either state.

The fifth factor, regarding the "nature and location of the evidence required to resolve the pending litigation," heavily favors Tennessee, in our view. Tenn. Code Ann. § 36-6-222(b)(5). Isaac's severe eczema has necessitated numerous medical appointments in Tennessee, and he was hospitalized here. It is highly likely that evidence regarding his medical issues will be required to resolve the pending custody litigation, as the hospitalization occurred right after Isaac returned from a visit to Minnesota, and the parties were already beginning to "point fingers" during the hearing below. Mother introduced photographs of the child's condition upon returning from Minnesota. She testified that she

_____

[12] "It should also be noted that since jurisdiction to make a child custody determination is subject matter jurisdiction, an agreement of the parties to confer jurisdiction on a court that would not otherwise have jurisdiction under this Act is ineffective." Tenn. Code Ann. § 36-6-216 cmt.; *see Files v. Files*, No. M2002-00132-COA-R3-CV, 2003 WL 354475, at *3 (Tenn. Ct. App. Feb. 18, 2003) (explaining that Missouri had jurisdiction to make the initial custody determination and that a consent agreement allowing the mother and child to relocate to Tennessee "could not change subject matter jurisdiction to a state other than Missouri" as "[s]ubject matter jurisdiction can only be conferred by statute or constitution").

was trained to administer Isaac's injections every 28 days, while Father had been opposed to the injections. She also suggested he may have discontinued a therapy recommended by Isaac's specialist. Mother was not aware of Isaac ever seeing a doctor in Minnesota. The trial court recognized the need for Isaac's doctors to be deposed in Tennessee but nevertheless found that it did not weigh in favor of conducting the litigation here because both parties already have counsel in Tennessee who can depose the child's doctors and any local witnesses. While that may be the case, it would certainly be much easier for their current Tennessee counsel to depose Tennessee doctors for litigation in Tennessee, and for counsel to otherwise participate in litigation here rather than in Minnesota. The trial court also noted that it may be necessary to depose witnesses at the child's daycare in Minnesota. If that is the case, however, we would expect the number and complexity of those depositions to be far less than the medical provider depositions to be conducted in Tennessee. Accordingly, we conclude that the factor regarding the "nature and location of the evidence required to resolve the pending litigation" weighs in favor of Tennessee.

The sixth and eighth factors are, respectively, "[t]he ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence" and "[t]he familiarity of the court of each state with the facts and issues in the pending litigation." Tenn. Code Ann. § 36-6-222(b)(6), (8). We conclude that these factors also weigh in favor of Tennessee. A modification proceeding has already been filed in Tennessee, and the trial court has already found that it has jurisdiction to modify under the UCCJEA. The Tennessee court has already heard from several witnesses and become somewhat familiar with the facts and issues in the pending litigation. In contrast, no petition to modify has been filed in Minnesota. The Minnesota court found that continuing the litigation in the Tennessee court system would be the "most appropriate and expeditious route" given that no request to modify is presently before the court there, and the court would have to schedule an evidentiary hearing, "further delaying this case and the parties' need to offer evidence already presented in Tennessee." As the Minnesota court aptly noted, counsel in Minnesota "will essentially need to start over and again present the parties' case in this state." Thus, we agree with the Minnesota court that these factors favor Tennessee.

In conclusion, the trial court erroneously gave outcome determinative weight to factor four, which we have found inapplicable. We find that four of the seven remaining factors weigh in favor of Tennessee. Consequently, the trial court abused its discretion in declining to exercise its jurisdiction on the basis that Tennessee is an inconvenient forum pursuant to Tennessee Code Annotated section 36-6-222. The trial court's dismissal of Mother's petition is hereby reversed.

On appeal, Mother also argues that the trial court erred by "failing to communicate with the Minnesota court prior to making the decision to decline jurisdiction." She notes that under the UCCJEA, communication between courts is required in some circumstances but not all, although it is encouraged. Her petition requested that the trial court, "[i]f

necessary, . . . communicate with the appropriate Virginia Court, in accordance with the UCCJEA and Tenn. Code Ann. § 36-6-213 and/or 36-6-221."

Section 36-6-213(a) provides that "[a] court of this state may communicate with a court in another state concerning a proceeding arising under this part." The Official Comment states that communication is required under specified sections of the act and "strongly suggested" in applying the inconvenient forum statute, and apart from those sections, "there may be less need under this Act for courts to communicate concerning jurisdiction due to the prioritization of home state jurisdiction. Communication is authorized, however, whenever the court finds it would be helpful." *Id.* cmt. In turn, the Official Comment to the inconvenient forum statute states, "Before determining whether to decline or retain jurisdiction, the court of this State may communicate, in accordance with Section 110, with a court of another State and exchange information pertinent to the assumption of jurisdiction by either court." Tenn. Code Ann. § 36-6-222 cmt.

Section 36-6-221, which Mother also cites, addresses previously commenced proceedings:

> (b) Except as otherwise provided in § 36-6-219, a court of this state, before hearing a child custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to § 36-6-224. If the court determines that *a child custody proceeding has been commenced* in a court in another state having jurisdiction substantially in accordance with this part, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this part does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding.
> (c) In a proceeding to modify a child custody determination, a court of this state shall determine whether a proceeding to enforce the determination has been commenced in another state. If a proceeding to enforce a child custody determination has been commenced in another state, the court may:
> (1) Stay the proceeding for modification pending the entry of an order of a court of the other state enforcing, staying, denying, or dismissing the proceeding for enforcement;
> (2) Enjoin the parties from continuing with the proceeding for enforcement; or
> (3) Proceed with the modification under conditions it considers appropriate.

(emphasis added). Subsection (b) does not apply because a "child custody proceeding" was never commenced in Minnesota. Under the UCCJEA definitions, a "child custody proceeding" "means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue," but it "does not include a proceeding involving . . .

- 22 -

enforcement under part 3 of this chapter." Tenn. Code Ann. § 36-6-205(4).

As for subsection (c), the Official Comment explains it as follows:

> Subsection (c) concerns the problem of simultaneous proceedings in the State with modification jurisdiction and enforcement proceedings under Article 3. . . . The court may wish to communicate with the enforcement court. However, communication is not mandatory.

Tenn. Code Ann. § 36-6-221 cmt. Thus, Mother has not demonstrated that any absolute mandatory duty existed requiring the trial court to communicate with Minnesota.[13] Moreover, it is undisputed that the trial judge did participate to a limited extent in the Minnesota hearing and informed the court that he intended to dismiss the Tennessee petition. We discern no reversible error in the trial judge's "failure to communicate" with the Minnesota court, as Mother's issue suggests. "While such communication may have been beneficial, it was not required." *Hibdon*, 2025 WL 3679028, at *5.

The next issue Mother raises on appeal is whether the trial court erred by "declining to assert significant connection jurisdiction." Because the trial court found that home state jurisdiction existed, and neither party challenged that decision on appeal, it is not necessary to consider whether jurisdiction would have alternatively existed under significant connection jurisdiction. *See Sykes v. Sykes*, 647 S.W.3d 596, 604 (Tenn. Ct. App. 2021) (describing this as an "alternate avenue" of jurisdiction); *Taylor*, 2014 WL 3734894, at *13 n.13 ("[W]e need not reach the issue of whether Tennessee had 'significant connections' jurisdiction under Section 36-6-216(a)(2) because our conclusion on home state jurisdiction resolves the issue."); *Staats*, 206 S.W.3d at 550 n.42 ("Given our conclusion that the trial court correctly determined that Tennessee would have home state jurisdiction to make an initial custody determination, we need not address Ms. McKinnon's challenge to the trial court's alternative finding under the significant connections/substantial evidence test."); *see also State, Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 290 (Tenn. Ct. App. 2006) ("While home state jurisdiction is given priority over all other types of jurisdiction, the next most important type of jurisdiction is 'significant connection jurisdiction' pursuant to Tenn. Code Ann. § 36-6-216(a)(2)(A)."). The trial court found

---

[13] During oral argument, in her argument regarding communication, Mother also relied on the latter part of Tennessee Code Annotated section 36-6-219(d), which is the statute providing for temporary emergency jurisdiction under the UCCJEA. However, that provision provides that "[a] court of this state which is exercising jurisdiction pursuant to §§ 36-6-216--36-6-218, upon being informed that *a child custody proceeding has been commenced in*, **or** *a child-custody determination has been made by, a court of another state* **under a statute similar to this section** shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." (emphasis added). Here, again, no child custody proceeding was commenced in Minnesota, nor did Minnesota make a child custody determination, under a statute similar to ours regarding temporary emergency jurisdiction.

that it had jurisdiction; it simply declined to exercise it.

The next issue Mother presents is whether the trial court erred "in failing to assert enforcement jurisdiction." She contends that states can enforce orders under the UCCJEA without modifying them and that enforcement proceedings mostly involve contempt actions. She notes that, in addition to seeking modification, her petition also requested that the court enroll and enforce the Virginia order.[14] Specifically, her petition asked the court to "enforce" the Virginia order by holding Father in contempt for violating its provisions regarding Facetime calls. Mother argues that the trial court's failure to address this separate request for enforcement "was in error." We agree. The trial court dismissed the petition altogether upon finding that Tennessee was an inconvenient forum. On remand, the trial court should separately consider Mother's petition for enforcement of the Virginia order with respect to her allegations of contempt. *See, e.g.*, *Stack v. Stack*, No. M2014-02439-COA-R3-CV, 2016 WL 4186839, at *4-6 (Tenn. Ct. App. Aug. 4, 2016) ("Although the trial court lacked subject matter jurisdiction to modify the child-custody determination of the Montana Court, the trial court did have authority to enforce visitation."); *Miljenovic*, 2013 WL 6665051, at *3 ("Accordingly, we vacate the order modifying the judgment because the court did not have subject matter jurisdiction to *modify* the judgment pursuant to the UCCJEA. Our holding does not impede the court's ability to *enforce* the registered foreign judgment."); *Butler v. Butler*, No. M2011-01341-COA-R3-CV, 2012 WL 4762105, at *4 (Tenn. Ct. App. Oct. 5, 2012) ("the procedural prerequisites for registering and enforcing a foreign custody order have no effect on the jurisdiction of the Tennessee court to modify the foreign order").[15]

The final issue Mother raises is whether the trial court erred by granting Father an award of his attorney fees. The trial court cited Tennessee Code Annotated section 36-6-236 of the UCCJEA, which provides that "[t]he court may award the prevailing party, . . . necessary and reasonable expenses incurred by or on behalf of the party," including attorney fees. Given our reversal of the trial court's decision to grant Father's motion to dismiss, we likewise reverse the award of attorney fees.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby reversed and remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, Christopher John Codino, for which execution may issue if necessary.

---

[14] "It is not necessary [] to enroll a foreign custody order in order to establish jurisdiction to modify it." *Taylor*, 2014 WL 3734894, at *6 n.5.

[15] We recognize that Father raised arguments in the trial court and on appeal regarding whether Mother's petition for enforcement complied with applicable procedural requirements. However, the trial court's order of dismissal did not address these arguments. It may consider them on remand.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE